### RASHEEN GIRAUD v. STATE OF CONNECTICUT*

Superior Court, Judicial District of Hartford
File No. CV-01-0809838

Corrected memorandum filed August 12, 2011[1]

*Proceedings*

*John W. Watson*, special public defender, for the petitioner.

---

\* Affirmed. *Giraud* v. *State*, 137 Conn. App. 621, 53 A.3d 244 (2012).

[1] The instant decision corrects a typographical error that was found on page sixteen in the court's June 17, 2009 memorandum of decision for the above captioned case.

*Dennis J. O'Connor,* senior assistant state's attorney, for the state.

MULLARKEY, J. In August of 2001, the petitioner, Rasheen Giraud, filed a petition for a new trial based on a claim of newly discovered evidence pursuant to General Statutes § 52-270[2] and Practice Book § 42-55.[3] The petitioner claims that certain posttrial admissions of witness Cleve Ward prove that Ward lied during his testimony at the petitioner's criminal trial, and, therefore, undermine Ward's credibility to such an extent that a new trial would likely produce a different result.

An evidentiary hearing was held before this court on May 14, 15 and 31, and December 14, 2007. Testimony was received from: the petitioner's criminal defense attorney, Martin Zeldis; Sergeant Timothy Madden; Assistant State's Attorney Kevin Russo; Cleve Ward's criminal defense attorney, Donald O'Brien; and Cleve Ward. In rendering its decision, this court has considered the testimony of the witnesses, as well as reviewed the complete transcript of the original trial, the DVD and transcript of Cleve Ward's polygraph examination, all relevant exhibits, and the parties' posttrial briefs.

For the reasons set forth below, the court denies the petition for a new trial.

### FINDINGS OF FACT

### I

### Summary

In June, 1998, the petitioner was convicted after a jury trial of murder, felony murder, robbery in the first

---

[2] General Statutes § 52-270 (a) provides in relevant part: "The Superior Court may grant a new trial of any action that may come before it, for . . . the discovery of new evidence . . . ."

[3] Practice Book § 42-55 provides in relevant part: "A request for a new trial on the ground of newly discovered evidence shall be called a petition for a new trial and shall be brought in accordance with General Statutes § 52-270. . . ."

degree, larceny in the second degree and kidnapping in the first degree.[4] The petitioner was sentenced by the court (*Barry, J.*) to a term of eighty-five years imprisonment. The conviction was affirmed on direct appeal. *State* v. *Giraud*, 258 Conn. 631, 783 A.2d 1019 (2001).[5]

As set forth by the Supreme Court's decision in the direct appeal, the jury could reasonably have found the following facts: "At about 2 a.m. on November 26, 1995, the [petitioner], Rasheen Giraud, observed the victim, Corey Gamble, pull up in a car to use the telephone at a telephone booth at a Hartford gas station. The [petitioner] approached the victim, asking for a ride to Charter Oak Terrace. Subsequently, the [petitioner] called his companion, Cleve Ward, over to the telephone booth and told Ward that they had a ride. The [petitioner] and Ward entered the car, the [petitioner] in the front passenger seat and Ward in the backseat on the passenger side. The [petitioner] then directed the victim to the boarded-up Rice Heights housing complex. There, the [petitioner] pulled out a gun, put it to the victim's head and ordered him out of the car. The [petitioner] took the victim to the back of the car and ordered him to remove his clothes. After the victim had removed his clothes, the [petitioner] ordered him to a grassy area and forced him to his knees. The [petitioner] then fired two gunshots at the victim, killing him. The [petitioner] gathered the victim's clothing and placed it in the backseat of the car. Then the [petitioner] drove the car from Rice Heights to Edwards Street, where he lived.

---

[4] The petitioner was also found guilty of robbery involving an occupied motor vehicle; however, at sentencing the court (*Barry, J.*) sua sponte vacated that conviction. *State* v. *Giraud*, 258 Conn. 631, 634, 783 A.2d 1019 (2001).

[5] The defendant initially appealed to the Appellate Court; however, the case was transferred to the Supreme Court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). *State* v. *Giraud*, supra, 258 Conn. 634.

"Later in the morning of November 26, 1995, Hartford police officers were directed to the parking lot at the rear of a building where they discovered the body of the victim, who was wearing only socks. Thereafter, the police interviewed the victim's mother, who told the police that in the early morning hours of November 26, she had asked her son to move a car that she had rented, a blue 1995 Pontiac Grand Am, from the front of her apartment building. She told police that this was the last time she had seen the victim.

"The police then began searching for the car that the victim's mother had rented. At approximately 9:58 p.m. on November 27, 1995, Hartford police observed the car at a gas station in Hartford. The police pulled the car over a short time later. The [petitioner] was driving the car and was wearing boots and a leather coat that had belonged to the victim. In the pocket of the coat was the victim's electronic organizer. The police then obtained a search warrant for the [petitioner's] apartment, and there recovered more of the victim's belongings: a pair of pants, a black leather belt that went with the coat and a set of keys." Id., 633–34.

## II

### The Petitioner's Criminal Trial

At the petitioner's criminal trial, the testimony of Cleve Ward established the facts surrounding the death of the victim.[6] Throughout the police investigation of Corey Gamble's murder, Ward provided three different versions of events pertaining to his knowledge of the crime. The police first interviewed Ward shortly after the homicide and the petitioner's arrest. At that time, Ward lived with his girlfriend, Ruby Rodriquez, and their infant daughter in a second floor apartment at

---

[6] Cleve Ward's testimony at the petitioner's criminal trial can be found in Exhibit B-4, Transcript Vol. III, 6/12/98, pp. 843–936 and Exhibit B-5, Transcript Vol. IV, 6/15/98, pp. 942–1014.

104-106 Edwards Street. Ward denied any knowledge of the crimes against Corey Gamble. In October, 1996, the police again interviewed Ward. At the time of the second interview, Rodriquez was in jail and Ward was living at his mother's house with his daughter and Rodriquez' son. In a signed statement,[7] Ward admitted to the police that he saw the petitioner—also known as "Swell-up"—at a club or bar the night of November 25 and that he unknowingly accepted a ride from the petitioner in the victim's car to the store on November 26. Ward further stated that during the ride to the store the petitioner displayed a handgun. He did not disclose any information concerning his knowledge of the robbery and murder.

Police received an anonymous tip, later learned to have come from Norman Edwards, who resided on the second floor of 104-106 Edwards Street. Edwards provided a written statement to the police in March, 1997, in which he stated that he heard Ward telling Rodriquez that he and another person killed a man in Rice Heights. Edwards also stated that Rodriquez had some jewelry that belonged to the victim. The police subsequently obtained a written statement from Rodriquez, in which she stated that Ward told her he and "Swell-up" (the petitioner) robbed, and that "Swell-up" shot, a man in Rice Heights. Rodriquez testified at the petitioner's criminal trial; however, Edwards did not testify. Neither statement was entered into evidence. Rodriquez' statement was used during her testimony, however, to refresh her recollection concerning assurance she gave to Ward that "Swell-up" was not a "snitch."

On or about March 17, 1997, Ward was arrested for felony murder, murder (accessorial liability), robbery in the first degree, conspiracy to commit robbery in the first degree and larceny in the second degree. In Ward's

---

[7] Exhibit K.

postarrest statement to the police,[8] as well as during his testimony at the petitioner's criminal trial, Ward admitted that he was with the petitioner at the time of the murder. He did not admit, however, to being anything other than an unaware and innocent observer of the crimes. Ward asserted that he went in the car with the victim and the petitioner because, although it was around 2 a.m., he wanted a ride to Charter Oak Terrace to visit his cousin, who had recently been released from jail. He stated that he believed the petitioner wanted a ride to meet up with some girls. Ward denied any knowledge of a plan to rob the victim, knowledge that the petitioner had a gun and any involvement in the murder. Ward stated that he did turn up the car radio upon instruction from the petitioner, and that after he did so he heard the petitioner shoot Corey Gamble.

In his March, 1997 statement to the police, Ward said: "A few days after Swell-up was arrested Ruby and me were on the back fire escape talking. I asked Ruby if Swell-up would snitch on me, Ruby told me Swell-up wouldn't snitch on nobody . . . ." That portion of Ward's statement was entered as a full exhibit under *State* v. *Whelan*[9] at the petitioner's criminal trial.

At the petitioner's criminal trial, on cross-examination the defense highlighted the omissions in, and evolution of, Ward's story to the police. The defense also got Ward to admit that he was untruthful in his October statement to the police. During closing argument, the defense argued to the jury that if they did not believe Ward's testimony then there would be reasonable doubt. The defense further stated to the jury: "[Y]ou cannot believe a word out of the mouth of Cleve Ward." The jury was also made aware of Ward's arrest for

[8] Exhibit L.

[9] *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

accessory to the murder and that his cooperation in the petitioner's case would be made known to the judge at the time of sentencing.

In addition to Ward's testimony, the state's case focused on the petitioner's possession (actual and constructive) of the victim's personal property, the petitioner's misstatements to the police as evidence of consciousness of guilt, and the forensic evidence. Concerning the petitioner's possession of the victim's property, when the petitioner was arrested he was wearing the victim's leather coat and boots, carrying the victim's pocket organizer in the coat pocket, as well as driving the car which was rented by the victim's mother. The belt to the coat and the victim's pants, in addition to the victim's house keys, were located in the third floor Edwards Street apartment where the petitioner was staying.

As for the petitioner's misstatements to the police, upon his arrest the petitioner stated that he purchased the leather coat at a store called Jay Fashion and the boots at a store called New York Fashion. The buyers for those stores testified that those items were neither purchased for, nor carried in, their stores. The petitioner stated that the pocket organizer belonged to Jose Laureano, who resided in the third floor Edwards Street apartment.[10] Laureano testified, however, that the pocket organizer did not belong to him. The petitioner also stated that a drug dealer named Michael Flemming gave him the keys to the victim's car and told him to bring the car back the next day. The petitioner told the police that Flemming was a drug dealer in Hartford and that he believed the car had been exchanged for drugs. The petitioner stated that he did not know where Flemming could be located. The police were unable to confirm the existence of such a person. The petitioner also

---

[10] Jose Laureano was the primary resident of the third floor Edwards Street apartment.

told police that he was staying on the second floor of the apartment at 104-106 Edwards Street with Ruby Rodriquez; however, Ruby Rodriquez, Jose Laureano and Shawn Thompson[11] testified that the petitioner was, in fact, living in the third floor apartment.

The forensic evidence included the presence of nitrates—components of gunpowder—on a black cloth coat identified as belonging to the petitioner. There were also components consistent with gunshot residue on the armrest window knob, armrest and door handle on the passenger side of the victim's car. The driver's side surfaces tested negative for gunshot residue. Ward testified that he was in the passenger seat of the car, with the petitioner driving, when he and the petitioner left the scene of the murder. Ward stated that when they returned to Edwards Street, he exited the passenger side of the vehicle and shut the door behind him. Ward further stated that after he walked up to the porch of the apartment building, he looked back and saw the petitioner sitting in the passenger seat of the car, with the door open, bending down as if he was doing something near his feet.

Among other things, the trial court thoroughly instructed the jury on the credibility of witnesses.[12] The

---

[11] Shawn Thompson stayed in the third floor Edwards Street apartment with Laureano and the petitioner.

[12] Exhibit B-6, Transcript Vol. V, 6/19/98, pp. 1243–45. Concerning the accuracy of witness testimony, the court stated: "If . . . you conclude that a witness has not only testified inaccurately but has testified falsely and has done so intentionally, wilfully, this fact casts a very serious doubt upon all that person's testimony and you might well consider that you cannot accept any of it. But that is a matter for you to determine and even though you find that a witness intentionally gave false testimony as to certain matters you may find that as to certain other matters he or she gave testimony worthy of acceptance by you as true. After all, whether you believe all of a witness' testimony or you believe only some portions of it or none of it is for you to decide."

trial court also instructed the jury regarding the inconsistent statements of Cleve Ward and another witness.[13] On that issue, the jury was instructed that evidence of the inconsistent statements could be considered for "impeachment purposes," as well as considered "substantively to prove the truth of the facts contained in the prior statements."[14] The jury was also instructed that they could infer, if they found that the petitioner was in possession of stolen property, that he had something to do with the stealing of that property.[15] The trial court also charged the jury on consciousness of guilt evidence.[16]

After the petitioner's conviction, the state made a plea offer to Ward for eight years, which Ward refused. Ward continued to deny any participation in the robbery and murder of Corey Gamble.

## III

### The Polygraph Examination

On March 24, 1999, approximately ten months after Ward's testimony at the petitioner's criminal trial, Ward

[13] Detective Steven Grabowski.

[14] Exhibit B-6, Transcript Vol. V, 6/19/98, p. 1250.

[15] Exhibit B-6, Transcript Vol. V, 6/19/98, p. 1251. Specifically, the court stated: "In this case the defendant was in possession of the victim's car, leather coat, boots and pocket organizer on the evening following the homicide . . . . If you find that the defendant, Mr. Giraud, was in possession of stolen goods you may infer that he had something to do with the stealing of the goods at the time they were stolen. This is a permissible inference, it is not a mandatory or necessary inference. But if you believe the facts warranted that it does indicate this and would permit you to draw an inference that the defendant participated in the larceny itself and if that is a reasonable and logical inference then you may make such an inference."

[16] Exhibit B-6, Transcript Vol. V, 6/19/98, pp. 1252–53. Specifically, the court stated: "In this case the state claims that the defendant when taken into custody gave false statements to the police regarding how he came into possession of a (1995) Pontiac, where he purchased certain clothes that he was wearing later identified as belonging to the victim in this matter and his comments with respect to his address. If you find that these statements were false you may draw the reasonable inference that they were made by the defendant to avoid detection for criminal acts and may show

voluntarily submitted (after consultation with his attorney) to a polygraph examination. The polygraph was conducted at the Connecticut State Police Polygraph Unit in Meriden, Connecticut. The polygraph test, as well as the pre and posttest interviews, were videotaped.[17]

Prior to the polygraph, Assistant State's Attorney Kevin Russo sent a letter to Sergeant Randy Howell of the polygraph unit.[18] According to the letter, Attorney Russo also provided copies of various documents: (1) Ward's arrest warrant; (2) Ward's statement to the police; (3) Ruby Rodriquez' statement to the police; (4) Norman Edwards' statement to the police; and (5) transcripts of Ward and Rodriquez' testimony at the petitioner's criminal trial. Attorney Russo provided some information regarding Corey Gamble's murder case and Ward's position as to his involvement in the crimes. Attorney Russo stated that Ward is alleged, but denies, "to have shared in the fruits of the robbery . . . ." Attorney Russo further stated that "[i]n all likelihood, [the state] will try Ward for larceny and hindering prosecution." Lastly, in the letter Attorney Russo stated that questions concerning the extent of Ward's involvement would be drafted and provided well in advance of the polygraph examination date.

Ward agreed to submit to the polygraph to prove that he had no part in the robbery and murder of Corey Gamble. During the pretest interview with then-Detective Timothy Madden, who also administered the polygraph test, Ward insisted that the version of events

---

a consciousness of guilt on the part of the defendant. This is not a necessary inference. It is up to you as the judges of the facts to decide whether the defendant's conduct at that time, when he was taken into custody, reflects a consciousness of guilt . . . ."

[17] The DVD of the entire interview and polygraph examination is Exhibit H. See also Exhibit E (Transcript of Polygraph Examination) and Exhibit D (Stipulation Re: Transcript of Polygraph Examination).

[18] Exhibit M.

he communicated to the police and testified to at the petitioner's criminal trial were accurate. (24:12-27:00)[19] Detective Madden explained that the state's attorney wanted more information about the crimes and Ward's involvement. Specifically, Detective Madden stated: "What the state's attorney wants to know, okay, did you get any of the jewelry from the guy? Did you know this was going to happen prior to going down? Were you involved? . . . Do you know where the gun is? That kind of thing." (27:13) Detective Madden suggested that if Ward admitted to conspiracy to commit robbery, he would be off the hook for the murder. (28:20) Detective Madden advised Ward this was his last chance to come clean, and intimated that if Ward maintained that he had nothing to do with the crime, but the state's attorney found out otherwise, the "hammer" would come down on Ward. (29:28) Ward was told that although the state's attorney didn't think that Ward was involved in the murder, he did believe that Ward knew about the robbery and acquired the victim's jewelry. (33:22) Ward stated that he rejected the state's plea offer of eight years because he neither had a part in the robbery, nor got anything out of it. (34:35) Detective Madden stated that if Ward cooperated with the state's attorney Ward would discover that things were going to work out for him. (35:05) Detective Madden further stated that if Ward remained "tight-lipped and then . . . fail[ed] [the polygraph], that [offer of] 8 years . . . is probably going to turn into 16, 20, 25." (35:20)

Detective Madden then began a role-playing exercise of sorts with Ward. Detective Madden asked Ward to play the judge and consider his own potential sentencing. (37:35-41:50) Detective Madden suggested that if Ward admitted he knew about the robbery but also

---

[19] This and subsequent citations point to the approximate time, as indicated by the timer on the DVD, that the cited statement or statements were made.

stated that he was in it to get some extra money for his baby daughter, had bad judgment, and had no intention of being involved in a murder, the court would be lenient at sentencing. (40:06-42:13) Detective Madden then told Ward a story about a "stupid" defendant named Nemlon Adams who, although the state's attorney knew he was involved in the crime, persisted in denying any knowledge of the crime and got "hammered" by the state. (42:14-43:28) "Nemlon Adams is in prison today because he's stupid. He didn't see an opportunity, he didn't take advantage of it. . . . [T]he brass ring was there, he had the key to get out, just tell the truth and get it over with, and he chose to be a dumb ass. . . . [H]e's serving time today because he's stupid." (43:11-43:28)

Throughout the interview, Detective Madden spoke to Ward about the importance of Ward's mother and daughter, as well as Ward's belief in God and forgiveness as a Christian. At one point, Detective Madden asked Ward if his mother would ever feel she could no longer care for Ward's daughter and place her in foster care. (45:14) Detective Madden also asked Ward if he thought God could forgive someone without first "com[-ing] forward and com[ing] clean" about the wrongs he had done. (47:36-48:03)

Just prior to the examination, Detective Madden explained to Ward how the polygraph worked and illustrated the machine's accuracy. Detective Madden even suggested one of Ward's responses: "The next question might be a relevant question. Uh, did you know . . . Rasheen was going to shoot this guy? Right. And you'll say no." (54:46) Detective Madden stressed it was important that Ward tell the truth. (1:11:37-1:12:03) He then reviewed with Ward the questions he planned to ask during the test. (1:12:04-1:14:29) During that review, Ward's answers were consistent with the version of

events he testified to at trial and attested to at the start of the polygraph interview.

During the polygraph examination itself, Ward admitted to further involvement in the crimes than he acknowledged during the pretest interview and testified to at the petitioner's criminal trial. Specifically, Ward admitted that he and the petitioner planned to rob the victim. (1:19:58) Consistent with his previous statements, Ward denied knowing that the petitioner was going to shoot the victim, that he received the victim's ring or necklace and that he gave any of the victim's property to Ruby Rodriquez. (1:20:24-1:21:46) When asked whether he had lied to the officer in any way that day, Ward replied, "No."[20] (1:22:12)

Immediately after the polygraph test, Ward stated that he "made a mistake" on the question regarding whether he lied to Detective Madden that day. (1:24:08) Ward admitted that he knew the petitioner planned to rob the victim and that he agreed to "watch [the petitioner's] back." (1:24:20) Detective Madden stated that he believed "in [his] heart" that Ward was not involved in the murder. (1:26:26) He reminded Ward to think about his mother and daughter, and stated that

---

[20] The relevant portions of the polygraph test are as follows:

"Q. Do you intend to lie to any of the questions on this test?

"A. No.

"Q. Did you plan with Rasheen [Giraud] to rob Corey Gamble?

"A. Yes.

"Q. Did you know Rasheen was going to shoot Corey Gamble?

"A. No.

"Q. Do you live in the state of Connecticut?

"A. Yes.

"Q. Did you receive a ring or necklace belonging to Corey Gamble?

"A. No.

"Q. Did you give any of Corey Gamble's property to Ruby Rodriquez?

"A. No.

"Q. Have you lied to me in any way since we've been talking today?

"A. No." (1:19:00-1:22:12.)

"in order to be forgiven as a Christian, you've got to tell the truth and take your responsibility." (1:26:46-1:27:55) Detective Madden further encouraged Ward to "come clean" with the truth. (1:30:12) Ward then admitted that the petitioner gave him the victim's ring and necklace, and that he in turn gave those items to Rodriquez. (1:30:38) Ward stated that he told Rodriquez to dispose of the jewelry and that he did not know what she did with the jewelry after he gave it to her. (1:31:07) Ward also admitted that he told Rodriquez about the incident. (1:31:30) Detective Madden assured Ward: "[Y]ou know, like I said, there's no way, no how they can pin this on you. They know who did it. . . . And I think by coming forward today and coming out with what you've come with, the picture's getting brighter and brighter for you . . . ." (1:32:55) In an attempt to encourage Ward to disclose additional information, Detective Madden stated: "You made a mistake. You know as well as I do, the good Lord will forgive you as long as you take responsibility for it, you know what I'm saying?" (1:35:24) Detective Madden told Ward that the state's attorney knew Ward was lying and that he was "trying to give [Ward] a chance to come forward with the truth." (1:37:40)

Upon further questioning from Detective Madden, Ward insisted that he did not know the petitioner had a gun at the time he agreed to assist with the robbery. (1:42:32) Ward was encouraged by Detective Madden: "[T]he fact that you knew he had a gun, that doesn't make you guilty of murder." (1:43:10) Ward continued, however, to deny any knowledge of the gun or involvement in the murder. Ward also insisted that the petitioner did not give him any cash. (1:44:35) Ward then proceeded to explain what happened during the incident. He stated that the petitioner put the gun in the

victim's face and told him to get out of the car. The petitioner then ordered the victim to take off his clothes. Ward stated that he asked the petitioner, "Why are you doing this?" The petitioner told Ward to get into the car and turn up the radio. Ward did as he was told. After the victim was killed, the petitioner got in the car and put the gun under the front seat—Ward was not certain which seat. Ward demonstrated the petitioner's actions with his right hand. (1:44:45-1:45:39)

Toward the end of the interview, Detective Madden summarized what his report to the state's attorney was going to say. He said to Ward, "you're going to say why didn't I just come out with this right up front," to which Ward replied that he was trying to find the best way out of the situation. (1:50) Shortly thereafter, Detective Madden stated: "I knew coming in here that what they had in store for you if you failed and said nothing was the heavy hammer. And what they had in store for you if you came forward with the truth was a lot better. So I think you might find your options are a little better when you get to court in the next couple of days." (1:53:15) Detective Madden then asked Ward whether he drove the victim's car at any time. (1:53:40) Ward maintained that he never drove the victim's car and that he saw the petitioner in the passenger seat of the car "putting on his boots or doing something down by his feet . . . or under the seat" when they returned to the apartment. (1:54:56-1:55:34)

Ultimately, Ward pleaded guilty under the *Alford* doctrine [*North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970)] to robbery in the first degree and hindering prosecution.[21] He received a total effective sentence of fifteen years imprisonment.[22]

---

[21] Exhibit F, Plea Hearing Transcript, 10/28/99, pp. 1–2.

[22] Exhibit G, Sentencing Transcript, 1/28/00, p. 15.

## IV

## The Petition for a New Trial

### A

### Documentary Evidence

The following is a summary of certain documents submitted as evidence at the hearing on the petition for a new trial.

### 1

### Statement of Norman Edwards[23]

On March 6, 1997, Norman Edwards gave a written statement to the police. In the statement, Edwards told police that on Sunday (November 26, 1995) he went to his niece Ruby Rodriquez' apartment to check her cable box. Edwards stated that while he was in Rodriquez' apartment, Rodriquez and her boyfriend, Cleve Ward, were "talking about something that happened in Rice Heights." Edwards stated that he heard Ward say that "they killed some dude in Rice Heights" and that "the dude got shot in the head." According to Edwards, Ward stated that "they made the guy get undress[ed]" and "they made the guy lay face down on the ground with his clothes off. . . ." Edwards stated that Ward "never said who shot the dude." Edwards stated that Rodriquez and Ward were talking about some of the victim's jewelry. Rodriquez stated that they needed to get the jewelry out of her apartment. Edwards stated that he saw Rodriquez holding a gold chain and a ring. Edwards stated that Ward told Rodriquez "they" searched the victim's car and "found extra car keys in the trunk under the spare tire." Edwards stated that Ward "was telling Ruby about a pizza place and a pay phone when they saw the dude." Edwards said that he left Rodriquez' apartment and went back to his apartment. He then

---

[23] Exhibit I.

told his wife what he heard. Edwards also told his wife that Ward was involved, but that he didn't know who pulled the trigger.

Edwards stated that on Sunday night Rodriquez' sister told him that she was with "Swell-up" when the police stopped him in the car. Edwards stated that he read in the paper about the dead body found in Rice Heights. He said that a few days later she saw Rodriquez and Ward talking on the back porch. Edwards stated that Ward asked Rodriquez if "Swell-up" would snitch. Rodriquez told Ward that "Swell-up is not a snitch and he won't tell on anybody."

Edwards stated that the detectives showed him eight photos and he identified the photo of the person he knew as Cleve Ward. Edwards signed the back of that photo. Edwards stated that prior to his written statement, he left messages for the police but never gave his name. He said that he told the police "to check Cleve out about the murder."

2

## Statement of Ruby Rodriquez[24]

On March 7, 1997, Ruby Rodriquez gave a statement to the police while incarcerated at the York Correctional Institution. In the statement, Rodriquez told police that on Sunday, November 26, 1995, Cleve Ward told her that he and "Swell-up" robbed a "dude" who was using the phone at a gas station. According to Rodriquez, Ward stated that "Swell-up" had the gun. Ward stated that he and "Swell-up" drove the man to the Rice Heights Housing Project. They told the man to take off his clothes. Ward told Rodriquez "as they were making the guy get undressed they were making fun on the guy's dick." Ward stated that he and "Swell-up" made the man get on his knees. Ward then said "Let's go."

[24] Exhibit J.

"Swell-up" told Ward to get into the car and turn the music up loud. Ward got into the driver's seat and turned up the radio. Ward then heard shots and saw "Swell-up" shoot the victim. Ward and "Swell-up" then proceeded to drive home. Rodriquez asked Ward why he and "Swell-up" did it, to which Ward replied "because the guy was there." Rodriquez told Ward that he "better not have anything from the guy in my house." Ward told Rodriquez that he did not. Rodriquez stated that she "heard they only got a necklace and a ring from the guy."

Rodriquez stated that her uncle Norman could have been present when Ward was telling her what happened. Rodriquez stated that she decided to talk to the police because she was "tired of the bullshit" and "concerned about [her] children." Rodriquez stated that Ward liked Pappa's Pizza downtown and "could have seen this guy who got killed there before with Swell-up. Rodriquez finally stated that while she and Ward were on the back porch of the apartment she told Ward "not to worry because Swell-up was no snitch. . . ."

## B

### Testimonial Evidence

At the hearing on the petition for a new trial, the petitioner's criminal defense attorney, Martin Zeldis, testified that there was an open-file policy with the state's attorney at the time of the petitioner's criminal trial. He stated that at some point prior to trial he saw the written statements of Norman Edwards and Ruby Rodriquez, in addition to the two written statements given by Cleve Ward. Attorney Zeldis further testified that he was aware of the contents of all the statements and that he used them in preparation for the petitioner's trial. Attorney Zeldis testified that the defense's theory

of the case was that the petitioner knew Ward's girl-friend, Ruby Rodriquez, and that the petitioner borrowed the car, coat and boots (which had belonged to the victim) from Ward. Attorney Zeldis testified that he received the information concerning Ward's polygraph after he left the Hartford Judicial District in 1999. Attorney Zeldis stated that he never saw the actual results of the polygraph, "whatever the polygraph machine showed regarding the truthfulness." He stated that after he viewed the video of Ward's polygraph and interview it was clear to him that Ward did not testify truthfully at the petitioner's criminal trial. Attorney Zeldis testified that if he had that evidence during the petitioner's criminal trial he would have used it to undermine Ward's credibility—"to try to show . . . that Cleve Ward was a liar . . . ." Attorney Zeldis further stated that other evidence from the video, such as his awareness that the polygraph examiner targeted specific issues to obtain a confession rather than seek the truth, would also have been useful to discredit Ward's testimony.

Sergeant (then Detective) Timothy Madden of the Connecticut State Police administered Ward's polygraph examination. Sergeant Madden testified that prior to administering the polygraph he was given a letter from the state's attorney directing his attention to specific issues of interest concerning Ward's involvement in the robbery and murder, including Ward's receipt of the victim's property. Sergeant Madden stated that although the letter indicates that various documents accompanied the letter, he did not receive or review any of those documents. He stated that he, in addition [to] Sergeant Randy Howell, made the decision regarding when to stop asking Ward questions. He acknowledged that he did not ask any additional questions after Ward admitted to the issues the state's attorney addressed in his letter. Sergeant Madden stated that no further questions were asked because, based on his

training as a polygraph examiner, testing on multiple issues could lead to false positives and inconclusive results.

Assistant State's Attorney Kevin Russo testified that he was assigned the case *State* v. *Cleve Ward* after the petitioner's criminal trial but before Ward's polygraph exam. Attorney Russo testified that he made, but Ward rejected, a plea offer of eight years. Although Ward denied any culpability in the crime, Attorney Russo doubted Ward's innocence in that: he did not believe Ward's claim that Ward took a ride with the victim to visit his cousin; other people said Ward knew what was going to happen to the victim; and, Ward claimed to be afraid of the petitioner but nevertheless accepted a ride from the petitioner the day after the murder. Attorney Russo testified that Ward's attorney suggested the polygraph to him. He stated that he reviewed Ward's testimony at the petitioner's criminal trial prior to the administration of the polygraph. Attorney Russo testified that he wrote a letter to the polygraph unit to provide some guidance as to the issues about which he was interested in gathering more information. He was not present during the polygraph, but he did review the audio and video from the examination and interview.

Attorney Donald O'Brien, Ward's criminal defense attorney, testified that the state did not make any specific promises to Ward in exchange for his testimony at the petitioner's criminal trial. He was told, however, that Ward's cooperation would be relayed to the sentencing judge. Attorney O'Brien stated that it was Ward's position that he was not involved in the crime; he was merely an innocent witness. Attorney O'Brien testified that the purpose of the polygraph was to show the state that Ward was telling the truth, and from that to get the case against Ward dismissed. Attorney O'Brien stated there was no agreement or discussion regarding the questions Ward would be asked during

the polygraph examination and that he did not recall seeing the state's attorney's letter to the polygraph unit. It was after the polygraph that Attorney O'Brien discovered Ward's admission to some involvement in the crime.

Cleve Ward testified at the hearing on the petition for a new trial on May 31, 2007. Ward testified that he knew a robbery was intended but did not know that the petitioner had a weapon until the petitioner displayed the gun. Ward admitted that when he first spoke to the police he said that he knew nothing about the incident. He testified that when he spoke to the police the second time the police told him that someone stated he was involved in the crime. Ward stated that he testified at the petitioner's criminal trial, not because he expected favorable treatment, but because "it was the right thing to do." Ward testified that he rejected the state's offer for eight years because his story was that he didn't do anything wrong. Ward stated that he mentioned to his attorney the possibility of taking a polygraph test.

Ward testified, consistent with his testimony at the petitioner's criminal trial and statements during the polygraph interview, that it was the petitioner who had the gun and shot the victim. He reiterated that the first time he saw the gun was when the petitioner displayed it to the victim. Ward admitted that he was lying when he told the police that he did not receive the victim's ring and necklace, and when he denied giving Rodriquez the jewelry. Ward testified that he lied at the petitioner's criminal trial because he was scared. He stated that he "didn't sign on" to the murder of the victim and that the petitioner did not tell him what was going to happen to the victim prior to the events unfolding.

Ward also testified, in contrast to his statements to the polygraph examiner, that he received some cash

from the petitioner in addition to the jewelry. Ward repeated multiple times at the hearing before this court that the petitioner gave him some of the victim's cash. This testimony was recanted at a subsequent hearing, held on December 4, 2007, at which Ward testified that he gave inaccurate information during his prior testimony and that he, in fact, did not receive any of the victim's cash from the petitioner.[25] Ward stated that he testified untruthfully because he "was nervous at the time" and "spoke out of frustration . . . or . . . irritation to this whole matter." He stated that he wanted "just to try to get an ending to this whole procedure." Ward elaborated: "[T]his [was] something that I went through in my life that I've been trying to put behind me for a long time. And that detail I felt maybe . . . wasn't a big thing. But after I had time and I thought about what I said, that's when I addressed my lawyer downstairs [in the lockup]. I thought, you know, from my past mistakes that maybe I should try to correct it. And that's what I tried to do."

Additional facts will be discussed as necessary.

## DISCUSSION OF LAW

The standard the trial court must apply to determine whether to grant a petition for a new trial based on newly discovered evidence is well established. "The petitioner must demonstrate, by a preponderance of the evidence, that: (1) the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial; (3) it is not merely cumulative; and (4) it is likely to produce a different result in a new trial. . . . This strict standard is meant to effectuate the underlying equitable principle that once a judgment is rendered it is to be considered final, and should not

---

[25] The December 14 hearing was held solely to allow Ward to correct his inaccurate testimony on the record.

be disturbed by posttrial [proceedings] except for a compelling reason. . . . In determining the potential impact of new evidence, the trial court must weigh that evidence in conjunction with the evidence presented at the original trial." (Citations omitted; internal quotation marks omitted.) *Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987).

I

## Newly Discovered Evidence

To satisfy the first requirement under the *Asherman* test, the proffered evidence must be newly discovered such that it could not have been discovered earlier by the exercise of due diligence. "When a [petitioner] seeks a new trial for newly discovered evidence, he must have been diligent in his efforts fully to prepare his cause for trial; and if the new evidence relied upon *could have been known with reasonable diligence*, a new trial will not be granted." (Emphasis in original; internal quotation marks omitted.) *State* v. *Roberson*, 62 Conn. App. 422, 427, 771 A.2d 224 (2001). Here, the petitioner asserts that Ward's admissions during the polygraph examination constitute new evidence that could not have been discovered at a prior date. The state, in its answer to the petition and posttrial brief, does not contest the petitioner's claim.[26]

The court notes, however, that based on the evidence submitted, it is apparent that at the time of the petitioner's criminal trial the defense was aware that Ward had previously admitted to additional involvement in the crime. As Attorney Zeldis testified at the hearing on the instant petition, the defense was familiar with the contents of the written statements given by Ruby Rodriquez and Norman Edwards. Those statements contain Ward's account—as provided by Ward to Rodriquez and

[26] Answer ¶ 59; Respondent's Posttrial Memorandum of Law, p. 6.

overheard by Edwards—of the crime, which is similar in substance to the version of events Ward admitted to during the polygraph interview. Thus, most of the information Ward divulged during the polygraph interview *was known* to the defense at the time of the petitioner's criminal trial.

It is true that some extremely precise details of Ward's involvement were provided for the first time during the polygraph interview: (1) Ward's statement that he "planned" with the petitioner to rob Corey Gamble; (2) Ward's statement that he agreed "to watch [the petitioner's] back"; and (3) Ward's admission that he gave Corey Gamble's jewelry to Rodriquez and "told her to get rid of it." These details, however, arguably could have been discovered with reasonable diligence through further investigation or upon cross-examination of Rodriquez and Ward. In fact, information from the Edwards statement was used in the questioning of Rodriquez. Edwards said in his statement that he heard Ward and Rodriquez talking about some jewelry, and that he saw Rodriquez holding a gold chain and a ring. Rodriquez was asked by the defense on cross-examination regarding whether she was seen in her apartment (presumably by Edwards) with a necklace and a ring— to which she replied, "No."[27] Edwards could have testified concerning what he saw to refute Rodriquez' testimony, but for whatever reason did not do so. Moreover, the defense likely sought to avoid further relying on Rodriquez' statement because much of what is in the statement implicates the petitioner.

In sum, the petitioner knew, prior to trial, that Ward had previously admitted to further knowledge of and involvement in the crimes. The only thing truly new about this evidence, which can be shown through the polygraph interview, is that the admissions came

---

[27] Exhibit B-4, Transcript Vol. III, 6/9/98, pp. 658–59.

directly from Ward's lips. There are also the few precise details Ward divulged during the polygraph interview that were not previously known to the defense. All of that being considered, this court does not believe it would be appropriate to deviate from the admissions made in the pleadings.[28] Accordingly, this court is disposed to find the first prong of the *Asherman* test satisfied.

## II

## Materiality

To satisfy the second element of the *Asherman* test, the petitioner must prove that the newly discovered evidence would be material at a new trial. Evidence is material when it involves a central issue in the case and is not collateral. *Adams* v. *State*, 259 Conn. 831, 836, 792 A.2d 809 (2002), citing *State* v. *Valentine*, 240 Conn. 395, 404, 692 A.2d 727 (1997). Impeachment evidence is material when it may affect the credibility of a state's key witness. See *Demers* v. *State*, 209 Conn. 143, 161–62, 547 A.2d 28 (1988) (trial court did not abuse its discretion in finding that if evidence of victim's prostitution arrest had been disclosed, such evidence would have had a significant impact on victim's credibility and, therefore, it was probable the result of the trial would have been different).

Here, the evidence is material to the credibility of the only eyewitness to the crime, Cleve Ward. Ward's testimony, if believed, helps to establish many of the elements of the crimes charged against the petitioner. Because Ward is the sole eyewitness—a factor that, in this court's view, tips the scale in the defendant's favor

---

[28] "Factual allegations contained in pleadings upon which the case is tried are considered judicial admissions and hence irrefutable as long as they remain in the case." (Internal quotation marks omitted.) *Benedetto* v. *Wanat*, 79 Conn. App. 139, 148, 829 A.2d 901 (2003); see also C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 8.16.3, pp. 481–82.

on this issue—his credibility was in the original trial, and would be in a new trial, central to the state's case and not collateral. This court therefore finds that the newly discovered evidence would be material in a new trial. The court notes, however, that although the petitioner's newly discovered evidence is material, for the reasons set forth below, it is not (nor is Ward's credibility in general) determinative of the case.

### III

#### Cumulative

The third element of the *Asherman* test requires that the newly discovered evidence not be merely cumulative. Cumulative evidence is additional evidence of the same kind as that submitted at trial, submitted to prove the same point. *Ginsburg* v. *Cadle Co.*, 61 Conn. App. 388, 392, 764 A.2d 210, cert. denied, 256 Conn. 904, 772 A.2d 595 (2001); see also *Waller* v. *Graves*, 20 Conn. 305, 310 (1850).

As mentioned previously, Ward's admissions during the polygraph interview contain some new, specific details not previously known to the defense. Moreover, it was during the polygraph interview that, for the first time, the admissions came directly from Ward himself. Accordingly, the court finds that the newly discovered evidence is not cumulative.

### IV

#### Likely to Produce a Different Result in a New Trial

To satisfy the fourth element of the *Asherman* test, the petitioner must prove that the newly discovered evidence is likely to produce a different result in a new trial. When applying the fourth part of the *Asherman* test, "[t]he trial court must always consider the newly discovered evidence in the context of the evidence presented in the original trial. In so doing, it must determine, first, that the evidence passes a minimum

credibility threshold. That is, if, in the trial court's opinion, the newly discovered evidence simply is not credible, it may legitimately determine that, even if presented to a new jury in a second trial, it probably would not yield a different result and may deny the petition on that basis. . . . If, however, the trial court determines that the evidence is sufficiently credible so that, if a second jury were to consider it together with all of the original trial evidence, it probably would yield a different result or otherwise avoid an injustice, the fourth element of the *Asherman* test would be satisfied." (Citation omitted.) *Shabazz* v. *State*, 259 Conn. 811, 827–28, 792 A.2d 797 (2002); see also *Adams* v. *State*, supra, 259 Conn. 838–39.

Thus, to prevail on this petition for a new trial, the newly discovered evidence must be sufficiently credible. "The court's role in analyzing the credibility of newly discovered evidence must strike an appropriate balance between two competing interests: First, the state has a general interest in preserving final judgments of conviction that have been fairly obtained and in ensuring that appropriate deference is given to the original trial as the forum for deciding the question of guilt or innocence within the limits of human fallibility . . . . Second, the petitioner has an interest, shared by the state and the judiciary, in ensuring that a wrongful conviction does not stand." (Internal quotation marks omitted.) *Daniels* v. *State*, 88 Conn. App. 572, 578, 870 A.2d 1109, cert. denied, 274 Conn. 902, 876 A.2d 11 (2005), quoting *Shabazz* v. *State*, supra, 259 Conn. 826.

This court has reviewed the DVD and transcript of the polygraph interview, as well as considered Ward's testimony from the hearing on this petition. This court has also taken into account the reasonableness of Ward's statements in light of the other evidence in the case. Based on that review, this court finds that Ward's

admissions during the polygraph interview are generally not credible.

The manner in which Ward's admissions were obtained severely diminishes their general reliability. First, it is apparent based on Ward's multiple statements during the police investigation, that Ward concedes more involvement in the crimes against Corey Gamble only as he feels it will be of benefit to him. The evolution of Ward's account began prior to the criminal trial. When he first talked with the police, Ward denied any knowledge of the incident. During Ward's second interview with the police, Ward admitted that he was with the petitioner only after the police informed him that he had been linked to the petitioner on the night of the crime. He admitted to no further involvement with the petitioner than that which was necessary to forestall the investigation. Ward admitted to being present during the scene of the crime only after he actually was arrested for the murder of Corey Gamble, but he did not admit to any criminal liability.

After the criminal trial, Ward's version of events changed yet again when he—with great assistance from the police polygraph examiner—recognized an opportunity to improve his situation. During the polygraph interview, at first Ward was insistent, as he was during the petitioner's criminal trial, that he had no part in the robbery. Ward also maintained, at first, that he did not receive any of the victim's jewelry. Ward's story changed, however, after Detective Madden urged and encouraged Ward to provide the information desired by the state's attorney. This was done by, inter alia, numerous references to Ward's family and God's forgiveness. Detective Madden also made multiple suggestions that Ward would be facing a harsh sentence if he persisted in his version of events and failed to cooperate

with the state. Detective Madden even told Ward, incorrectly, that Ward could not be subject to liability for the murder if he admitted to conspiracy to commit robbery.

Upon Detective Madden's persistent direction, Ward admitted that he and the petitioner planned to rob Corey Gamble and that he agreed to "watch [the petitioner's] back" during the commission of the crime. Further urging led to Ward's admission that the petitioner gave him the victim's ring and necklace, which he in turn gave to Ruby Rodriquez for disposal.

It is apparent to this court that Ward's statements were not merely obtained during the polygraph examination and interview—they were produced, or directed, through Detective Madden's insincere encouragement. Ward admitted to what he was told the state's attorney wanted to hear and only after he realized there would likely be negative consequences for him if he did not do so. Ward's admissions during the polygraph demonstrate that he is willing to say whatever is necessary to save himself. Ward personally demonstrated this tendency for the court when he, at the hearing on this petition, testified untruthfully that he took some of the victim's money because he was frustrated and wanted "just to try to [end] this whole procedure." For those reasons, the court is inclined to find the newly discovered evidence remarkably incredible.

A determination that the newly discovered evidence is not credible, however, cannot end the court's inquiry. The central focus of the petition is that the new evidence, which reveals Ward's unremitting proclivity to lie, will render his testimony as a whole so incredible that it would be totally rejected by a new jury. Given that, the court will assess what impact the evidence may have if presented to a new jury.

"[W]hether a new trial should be granted does not turn on whether the evidence is such that the jury could

extend credibility to it. . . . The [petitioner] must persuade the court that the new evidence he submits will *probably*, not merely possibly, result in a different verdict at a new trial . . . . It is not sufficient for him to bring in new evidence from which a jury could find him not guilty—it must be evidence which persuades the judge that a jury *would* find him not guilty." (Emphasis altered; internal quotation marks omitted.) *Shabazz* v. *State*, supra, 259 Conn. 823.

In general, courts are cautioned against granting a petition for a new trial based solely on impeachment evidence. "[N]ew trials [typically] are not granted upon newly discovered evidence which discredits a witness unless the evidence is [both] vital to the issues and . . . strong and convincing . . . . The rule restricting the right to a new trial when one is claimed on the basis of newly discovered evidence merely affecting the credibility of a witness is necessary because scarcely has there been an important trial . . . [after which a] diligent search would not have discovered evidence [to impeach] some witness . . . . Without such a rule, there might never be an end to litigation." (Citation omitted; internal quotation marks omitted.) *Adams* v. *State*, supra, 259 Conn. 839.

The present case is not one where the star witness has recanted his testimony with the effect of lessening the petitioner's culpability. Cf. *Smith* v. *State*, 139 Conn. 249, 93 A.2d 296 (1952) (upholding denial of petition for new trial where state's witness, who placed petitioner in stolen car used to commit a murder, later stated under oath in a deposition that she never saw petitioner in the car). Here, Ward admits to being untruthful about his knowledge of and involvement in the robbery, as well as his receipt of the victim's jewelry; however, his account of the petitioner's involvement in the crimes has remained unchanged. Ward has continually maintained that the petitioner had the gun, shot the victim

and drove the victim's car. This version of events is generally consistent with Ward's prior statements to Ruby Rodriquez.[29] The circumstantial, forensic and consciousness of guilt evidence presented at the criminal trial further support that version of events.

Although the petitioner is correct that at his criminal trial the trial court stated, in denying a motion for judgment of acquittal, that the trial was "essentially a credibility case,"[30] in this court's view there was much more to the case against the petitioner than the testimony of Cleve Ward. First, there was the petitioner's possession of the victim's belongings. Ward was arrested approximately thirty-six hours after the crime driving the victim's car and wearing the victim's clothes, the keys to the victim's car, the belt to the victim's jacket and the victim's pants were found in the apartment where the petitioner was staying. Second, there was forensic evidence linking the petitioner to the crime. The black cloth coat, identified as belonging to the petitioner and found by the police in the closet used by the petitioner, had components of gunpowder on both sleeves. Components consistent with gunpowder residue were also found in the victim's car. Third, the petitioner's multiple misstatements to the police served as evidence of his consciousness of guilt. Accordingly, although it would be a closer call for a new jury, based on the evidence admitted in the original trial, the court cannot conclude that the result would probably be different absent Ward's testimony. Moreover, because some of this evidence is consistent with, and bolsters, Ward's version of events, although a new jury may reject some or most

---

[29] Even if Ward's alleged disclosure to Ruby Rodriquez that he drove the victim's car back to Edwards Street after the murder (see Exhibit J) is true, the fact that the petitioner was, at some point, in the passenger seat of the vehicle where the gunshot residue was found remains unchanged.

[30] Transcript Vol. IV, June 16, 1998, p. 1022.

of Ward's testimony based on his issues with truthfulness, it is unreasonable for this court to conclude that the jury would discard Ward's testimony in its entirety.

In addition, at the petitioner's criminal trial the jury was aware of Ward's untruthful statements to the police. Of significant importance is the statement Ward made at the time of his second interview with police in October, 1996, which was a sworn, written statement. It is reasonable for this court to infer that in determining Ward's credibility the jury took into consideration that Ward, having lied to the police in a previous sworn statement, may also lie while testifying under oath on the witness stand. In addition, a portion of Ward's March, 1997 statement regarding his concern that the petitioner would "snitch" on him was admitted as evidence as an inconsistent statement for impeachment purposes, as well as substantive evidence to prove the truth of the facts contained in his statement. The defense also pointed out Ward's arrest as a codefendant in the robbery and murder of Corey Gamble, as well as the possibility of Ward receiving favorable treatment at sentencing. Thus, Ward's credibility was effectively impeached in front of the jury. Additional impeachment concerning Ward's tendency to lie would not necessarily render his account of the incident worthless to a new jury.

Based on the foregoing, this court concludes that it is simply not *probable* that further impeachment of Ward, based on his admissions during the polygraph examination and interview, *would* produce a different result at a new trial.

In his posttrial brief, the petitioner argues that the court may deviate from the traditional four-pronged *Asherman* test in deciding the instant petition for a new trial. Specifically, the petitioner asserts that the court may focus its analysis on the more general princi-

ple of whether a new trial would be necessary to avoid an injustice.

The petitioner cites to *Reilly* v. *State*, 32 Conn. Sup. 349, 355 A.2d 324 (1976), and *Santiago* v. *State*, 47 Conn. Sup. 130, 779 A.2d 868 (1999), aff'd, 64 Conn. App. 67, 779 A.2d 775, cert. denied, 258 Conn. 913, 782 A.2d 1246 (2001), in support of his position. In those cases, where the petition for a new trial was granted, the trial court concluded that "in certain serious criminal cases, if it appears . . . that evidence which is adduced at the hearing on the petition for new trial could have a persuasive impact on a jury and might well be sufficient to turn the cause in favor of the applicant . . . an injustice would be done to the petitioner if a new trial is not granted even if all the traditional criteria for granting a new trial on the basis of newly discovered evidence are not satisfied." (Internal quotation marks omitted.) *Santiago* v. *State*, supra, 132, quoting *Reilly* v. *State*, supra, 372.

The Connecticut Supreme Court has noted that "[i]n addition to considering the specific elements [of the *Asherman* test] . . . a [trial] court's decision on the petition should be guided by the more general principle that a new trial will be warranted on the basis of newly discovered evidence only where an injustice was done and whether it is probable that on a new trial a different result would be reached." (Internal quotation marks omitted.) *Shabazz* v. *State*, supra, 259 Conn. 821. Moreover, in *Joyce* v. *State's Attorney*, 84 Conn. App. 195, 203, 852 A.2d 841, cert. denied, 271 Conn. 923, 859 A.2d 578 (2004), the Appellate Court recognized that the cases in which the courts have looked beyond the traditional test—including *Santiago*, *Reilly* and *Shabazz*—involved criminal convictions for murder and manslaughter. Id., 203–204.

In the present case, there is no question that the petitioner's convictions are of a very serious nature.

This court, therefore, finds that this is an appropriate case to consider, as a general matter, whether a new trial would be necessary to avoid an injustice. Based on the details outlined previously (which do not need to be repeated here), this court simply cannot conclude that the newly discovered evidence, taken within the context of the evidence submitted in the original trial, requires a new trial because an injustice has been done and a different result is probable. See *Smith* v. *State*, supra, 139 Conn. 251, 253.

### CONCLUSION

Based on the foregoing, the petition for a new trial is denied.